IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,

AT AUSTIN

---

NO. 3-87-210-CR

---

WILLIAM R. FREEMAN,

APPELLANT

vs.

THE STATE OF TEXAS,

APPELLEE

---

FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT

NO. CR87-0212-A, HONORABLE CURT F. STEIB, JUDGE

---

William R. Freeman appeals from a judgment of conviction for the offense of murder. Tex. Pen. Code Ann. § 19.02(a)(1) (1974). The jury assessed punishment at life imprisonment. We will affirm the judgment.

Freeman contends in his first point of error that the State has failed to prove each element of the offense beyond a reasonable doubt and, consequently, his conviction violates the due process of law provisions of both the federal and state constitutions. We disagree.

The elements of the crime of murder applicable to this case are: (1) a person; (2) intentionally or knowingly; (3) causes the death; (4) of another person. Id. Freeman admitted killing the victim, Donald Morris Hazelwood, but claimed he did so in self defense or accidentally. We review the evidence to determine whether it is sufficient to prove Freeman killed Hazelwood "intentionally or knowingly," but not in self-defense.

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. A person acts knowingly with respect to his conduct when he is aware his conduct is reasonably certain to cause the result. Tex. Pen. Code Ann. § 6.03(a) and (b) (1974). A person is justified in using deadly force in self-defense against another when and to the degree he reasonably believes the deadly force is immediately necessary against the other's use or attempted use of unlawful deadly force and a reasonable person in the actor's position would not have retreated. Tex. Pen. Code Ann. §§ 9.31 and 9.32 (1974 & Supp. 1988) (selecting only those elements applicable to this appeal).

The standard for reviewing sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases. The evidence must be viewed in the light most favorable to the verdict, and the standard is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Alexander v. State, 740 S.W.2d 749, 757 (Tex. Cr. App. 1987).

Viewing the evidence in the light most favorable to the verdict, the record reveals the following: At approximately 7:15 A.M. on Tuesday, April 14, 1987, Tom Green County Deputy Sheriff Louis Camelbeek, while on duty at the Sheriff's Department, received a telephone call from Freeman. Freeman told Deputy Camelbeek "I had to shoot an old boy last night, and I think he's

2

in pretty bad shape." Freeman explained that he was at his home and Deputy Camelbeek agreed to meet with him there.

Upon arriving at Freeman's residence, Freeman met Deputy Camelbeek at the door; once inside, the deputy saw Freeman's wife, Martha A. Freeman. Deputy Camelbeek informed Freeman of his rights by reading from a card. Freeman signed the card, knowingly and voluntarily waiving his rights. Freeman asked Deputy Camelbeek if he knew Donnie Hazelwood. Camelbeek replied that he did. Freeman said, "Well, that's who I had to shoot," because Hazelwood threatened him with a knife. A short time later, Lieutenant Louis Hargrave of the Sheriff's Department arrived and Freeman agreed to take the officers to the scene of the shooting.

Freeman led the officers to his wife's cabin in a place called the Dove Creek Development. The cabin is located near a river and is a thirteen-by-twelve foot relatively crude structure with a corrugated tin roof. It is enclosed by a wire mesh fence. The officers found the gate to the fence secured by heavy electrical wire.

Freeman opened the gate and led the officers into the small cabin. Immediately to their left as the officers entered the cabin, they found the victim, Donald Morris Hazelwood, lying face down on a mattress and box spring located on the cabin's concrete floor. Deputy Camelbeek described the cabin as unkept, a little sloppy, little pieces of food and a few pennies lying on the floor, "just stuff that gets dropped that nobody bothers to pick up," but no appearance of a struggle.

Hazelwood was partially covered by a blanket. The officers pulled the blanket back and found the victim with his head on his hands and a pillow, as if he had been sleeping. There was a large loss of blood, the body cold and rigid, with one gunshot wound to the right temple. There was no blood on the floor or walls of the cabin. A black-handled knife was lying on the floor beside the bed, and a Remington Model 582, .22 caliber rifle with

3

a scope leaned against the cabin wall by the door. A .22 casing was found by the door and an empty cartridge found in the gun.

Hazelwood's red Audi was parked seventy-five feet from the cabin. A damaged briefcase was found on the car's left rear floorboard. The briefcase contained personal papers of the victim. The victim's car keys were never found.

Justice of the Peace Edward L. Harris arrived at the scene and pronounced the victim dead. He, too, testified that the victim was found lying face down with his arms folded under his forehead and his head turned slightly to the right with a single bullet wound in the right temple. Justice Harris ordered an autopsy and instructed the officers to transport the body to the Bexar County Medical Examiner in the same position that it was found.

Deputy Sheriff Christopher Wayne Cherry testified that he transported the body to the Bexar County Medical Examiner, according to Justice Harris' instructions. Robert C. Bux, M.D. performed the autopsy at 4:00 P.M. on the same day the body was discovered.

Dr. Bux testified that the temple gunshot wound was the only trauma suffered by the victim and was the cause of death; there was no evidence the victim had been kicked or punched. Dr. Bux described the wound as concentric with seared margins and with soot and powder inside, a "hard-contact" wound, one produced by holding the muzzle of the weapon flatly against the skin; Dr. Bux identified portions of the imprint of the muzzle on the skin. The bullet traveled right to left, front to back, and slightly up. The wound was consistent with one that a .22 rifle held in hard-contact with the skin would have produced. Dr. Bux further testified that it would be impractical to wield a weapon of that length during a struggle and still achieve flat contact.

The settling of the victim's blood was consistent with a theory that he was shot where he was lying and that he was not *

4

moved. Dr. Bux discovered a small quantity of marijuana in the victim's pants pocket. There was also evidence of marijuana in the victim's blood. The marijuana level in the different organs of the body suggested the victim had earlier had a higher level of marijuana in his blood.

Texas Department of Public Safety forensic scientist Patricia Hulen interpreted the spatter patterns of the blood stains found at the shooting scene. Hulen found the blood patterns to be consistent with a theory that the victim was shot where he was lying. There was no indication that the victim moved or had been moved, especially since no blood was found on the floor. Although Hulen expected the muzzle of the gun to contain blood and it did not, she testified the muzzle might have simply been wiped off. Blood on the victim's face was placed there by the blanket being drawn over him. A blood stain on the victim's left sleeve may have been a hand print, however, Deputy Cherry testified that Dr. Bux's helpers put all the victim's clothes in one bag when they were still wet with blood and this may have caused the smudge on the victim's sleeve.

Bexar County Regional Crime Lab firearms and toolmark examiner Richard Stengel testified that the .22 rifle found at the cabin had a normal trigger action. The ammunition found in the rifle were .22 caliber "lubaloy" hollow point bullets, the same kind of bullet fragments removed from the victim by Dr. Bux. Although Stengel could not positively say the fragments recovered from the victim were fired from the rifle found at the cabin, he testified this was not unusual with hollow point bullets because "they fragment up pretty bad usually."

The victim's father, David Lawrence Hazelwood, Sr., testified that his son "always . . . laid on his arm on a pillow or cushion . . . or his hands" when he slept. Mr. Hazelwood testified his son slept in a manner similar to the way he appeared in a photograph taken at the scene before the body was moved.

Freeman gave the Sheriff's Department two written statements; both statements were introduced in evidence. The first statement given on April 14, 1987, was similar to Freeman's account of the shooting given at the trial. Freeman and Hazelwood had worked together as law enforcement officers in the past. They were both looking for work and Hazelwood said he had opportunities for them in Tennessee. According to Freeman, Hazelwood picked Freeman up at Freeman's house at 10:30 A.M. on April 13, 1987. Because Hazelwood had a court appearance the next day, the two men decided to go to Freeman's wife's cabin and fish and spend the night and leave for Tennessee after Hazelwood's court appearance.

Apparently it was too windy to fish so, according to Freeman, the men watched television and talked. Hazelwood was smoking marijuana and had been most of the day. Hazelwood allegedly became angry and upset with Freeman because he believed Freeman told his girlfriend about a trip he took three years before to see his wife in Oklahoma. Freeman said Hazelwood picked up Freeman's switchblade knife and began opening and closing it while the two men were sitting on the bed.

According to Freeman, Hazelwood lunged at him with the knife and Freeman jumped up allowing the knife to strike a pillow. Freeman says he then hit Hazelwood in the right temple with a left hook and pushed Hazelwood down with his foot. At the same time, Freeman said, he took his .22 rifle from its stand and shot Hazelwood in the right temple area. At trial Freeman testified that the rifle discharged as he switched it from his left hand to his right. (Apparently his left hand had been injured in a tablesaw accident). Freeman testified that he merely wanted the victim to see the barrel of the rifle when he regained consciousness.

Freeman stated that he placed Hazelwood's hands under his head to clear Hazelwood's airway and that he attempted to determine

if Hazelwood had a pulse. Freeman said he pulled the blanket over Hazelwood to stop the bleeding.

He added that he broke into Hazelwood's briefcase looking for the car keys, but could not find them; so he rowed a boat across the river and went to two houses until he found a phone. He called his wife and asked her to pick him up at the cabin. He then returned to the cabin and burned the pipe that Hazelwood was smoking, purportedly so no one would think he was smoking marijuana.

When his wife arrived, Freeman told her that Hazelwood was going to spend the night at the cabin. Freeman and his wife returned to their house and Freeman apparently stayed up all night, finally telling his wife what happened and calling the Sheriff's Department. He said he did not call earlier because he was a long time friend of Hazelwood's family and was not prepared to talk to them.

In his second statement, given on April 15, 1987, the details are essentially the same except the manner in which the shooting occurred. In that statement, Freeman said Hazelwood was smoking marijuana and Freeman was drinking rum and coke. According to Freeman, he was watching some fishermen on the river when Hazelwood placed the barrel of the .22 rifle by his head and fired a shot out the cabin door. Freeman said the shot startled him, but then the two men laughed about it.

According to this statement, they continued talking until Hazelwood started to fall asleep. Hazelwood was "dozing off kind of heavy and started snoring." Freeman said at this point that he decided to pay Hazelwood back for frightening him earlier, so he picked up the rifle and walked around to Hazelwood's side of the bed. The statement continues that, as Freeman bent over "to lay the gun parallel to the ground, [he] pulled the trigger."

Freeman said he then rowed across the river and called his wife, returning to the cabin and burning the marijuana pipe *

7

just as he said he did in his first statement. He said he then opened the switchblade knife and stabbed a pillow and dropped the knife on the floor. When his wife picked him up they returned to their home. Freeman told his wife what happened and called the Sheriff's Department in the morning because, he said, he was not going "to let somebody walk in and discover it." Freeman stated that he "made up the story about how it went down." (That he killed Hazelwood in self-defense.) He said he just "put together something to keep [him] out of jail." He felt the killing was an accident caused by his getting drunk again. At trial, Freeman testified this second statement was only given because he knew it was what the investigators wanted to hear. He said Hazelwood never fired the rifle out the cabin door.

At trial, the State introduced a videotape of the murder scene. There was other testimony introduced by both sides, not significant to this point of error.

Viewing the evidence in the light most favorable to the verdict, we must determine whether any rational trier of fact could have found beyond a reasonable doubt that Freeman intentionally or knowingly shot Hazelwood, but not in self-defense.

The victim was found lying face down in the same position he normally slept. Blood tests indicated the victim had been smoking marijuana and that the level of the drug in his blood was higher before the time of death. The settling of the victim's blood and the blood-spatter patterns found at the scene indicate the victim was shot while lying down.

There was no evidence of a struggle. The blood-spatter patterns found at the scene were consistent with a theory that the victim was shot while he slept. The medical examiner described the wound as a "hard contact" wound, one made by holding the muzzle of a weapon flat against the skin; it would be difficult, if not impossible for Freeman to have placed the barrel of the rifle flat against Hazelwood's skin during a struggle, especially considering

8

the fact that Freeman had only one good hand. There was no evidence the victim was punched or kicked as Freeman testified at trial and in his first statement to the police.

Freeman's statements to police and his trial testimony were contradictory and significantly undermine his credibility. There is no satisfactory explanation tending to show how Freeman's gun "accidentally discharged" when he purportedly attempted to scare the victim. There is, instead, Freeman's statement that he pulled the trigger.

Freeman's claim of self-defense is undermined by his inconsistent statement to police that he shot the victim accidentally, stabbed the pillow with the switchblade knife and dropped the knife on the floor to make it look like self-defense. Freeman's credibility is further undermined by the fact that he waited all night to call the police. Viewing the evidence in the light most favorable to the verdict we conclude the evidence is sufficient to sustain the conviction. Freeman's first point is overruled.

Freeman contends in his second point of error that the trial court erred in admitting in evidence a videotape of the shooting scene because the videotape was inflammatory and was introduced without a proper predicate having been made. We conclude this point is not preserved for review.

In order to preserve a complaint for appellate review, a party is required to present a timely and specific objection to the court below. Tex. R. App. P. Ann. 52(a) (Supp. 1988). At trial, Freeman timely objected to the introduction of the videotape, but on the grounds that it was "repetitious and unnecessary." Freeman did object to the introduction of the videotape on the grounds that it was "prejudicial," but only after the videotape was shown to the jury. This objection, although specific, was untimely. Thompson v. State, 691 S.W.2d 627, 635 (Tex. Cr. App. 1985). Freeman's second point of error is overruled.

The judgment of conviction is affirmed.

Bob Gammage, Justice

[Before Chief Justice Shannon, Justices Gammage and Aboussie]

Affirmed

Filed:   August 31, 1988

[Do Not Publish]